IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

```
--------------------------------------------------------------X
                                           :
BARBARA J. CAREY, JAMES R. CAREY,          :
DAVE FLECKENSTEIN and MILDRED PITTS,       :     Case No.
on behalf of themselves                    :
and all others similarly situated,         :
                                           :
                         Plaintiffs,       :     CLASS ACTION
                                           :     COMPLAINT
             - against-                    :
                                           :     JURY TRIAL
GEORGE D. HUDGINS,                         :     DEMANDED
ROSENTHAL COLLINS GROUP, LLC               :
AND Does 1 through 10,                     :
                                           :
                         Defendants.       :
                                           :
--------------------------------------------------------------X
```

As and for their Class Action Complaint, plaintiffs Barbara J. Carey, James R. Carey,

Dave Fleckenstein and Mildred Pitts ("Plaintiffs") allege[1] as follows:

## I. SUMMARY

1.      From at least January 1, 2005 to May 13, 2008 ("Class Period"), defendant

George D. Hudgins d/b/a George D. Hudgins L.L.C. ("Hudgins"), with the assistance of others,

fraudulently solicited members of the general public to pool together millions of dollars to trade

futures contracts and options on futures contracts in violation of the anti-fraud provisions of the

Commodity Exchange Act ("CEA" or "the Act"), as amended, 7 U.S.C. §§ 1 *et seq.* (2002), and

the regulations promulgated thereunder ("Regulations"), 17 C.F.R. §§ 1.1 *et seq.* (2008).

---

[1]Plaintiffs' allegations pertaining to plaintiffs and their counsel are made on knowledge.
All other allegations are made upon information and belief except as otherwise noted.

2.      In order to induce current and prospective investors to invest or reinvest, Hudgins, as the unregistered commodity pool operator ("CPO") and general partner for the pool, 3737 Financial L.P. a/k/a Hudgins Group a/k/a Hudg-Investments ("3737 Financial" or the "Commodity Pool"), made numerous material misrepresentations and omissions, including, among others:

(a)      Falsely representing that the Commodity Pool had a successful track record trading futures and options on futures since 2000, when, in fact, the Commodity Pool was not even in existence until 2004;

(b)      falsely representing, and grossly inflating, the total amount of funds under management and traded in the Commodity Pool;

(c)      falsely representing the Commodity Pool's purported historical profitability, and grossly inflating any such profitability, when, in fact, Hudgins' trading in futures and options on futures resulted in losses exceeding $28 million since December 2003;

(d)      failing to disclose that Hudgins was trading investor money in his own personal trading account at Rosenthal Collins Group LLC ("RCG") and not in any trading account opened in the name of the Commodity Pool; and

(e)      issuing false statements regarding the purported "returns" of the Commodity Pool in monthly and/or quarterly newsletters and other promotional material.

3.     As a result, Hudgins has knowingly engaged in acts and practices in violation of

Sections 4o(1), 4b(a)(2)(i)-(iii), 4c(b), and 4m(1) of the Act, 7 U.S.C. §§ 6o(1), 6(b)(a)(2)(i)-

(iii), 6c(b) and 6m(1), and Regulations 4.41(a) and 33.10(a)-(c), 17 C.F.R. §§ 4.41(a) and

33.10(a)-(c). Hudgins was assisted in these primary allegations and aided and abetted by Does 1

through 10.

4.     Hudgins was also aided and abetted by, among others, defendant RCG, a

registered futures commission merchant ("FCM") who carried all of the accounts utilized by

Hudgins in connection with his fraudulent scheme and assisted and aided and abetted Hudgins

notwithstanding the fact that RCG knew that Hudgins was:

(a)     Trading in his personal accounts for scores or hundreds of outside

investors at all relevant times during the Class Period;

(b)     bringing potential investors to RCG's offices and facilities in Chicago,

including, without limitation, RCG's stations on the floor of the Chicago

Mercantile Exchange ("CME"), as part of a fraudulent scheme whereby

Hudgins held himself out to investors and RCG employees confirmed that

Hudgins was closely affiliated with RCG;

(c)     making representations in the presence of RCG employees and/or officers

that potential investors' funds were "secured" and "bonded" by RCG;

(d)     violating CFTC rules by depositing investor funds into the personal

accounts of Hudgins at RCG;

(e)     operating as an unregistered CPO through the personal accounts Hudgins

held at RCG;

(f)     on information and belief, having investors either send or wire funds to RCG with instructions to deposit the funds into the personal accounts of Hudgins for trading in futures and options on futures; and

(g)     incurring massive trading losses while running up gigantic commissions that were paid to RCG in connection with his rapid-fire day trading strategy.

5.      Notwithstanding its knowledge of the foregoing, RCG permitted Hudgins to utilize the RCG name, reputation, facilities, personnel, agents and employees, including Mark "Hoss" Lupori ("Lupori") and Randy Berman ("Berman"), to solicit investments from investors Hudgins brought to the RCG offices and facilities.  RCG also permitted Hudgins to execute high volume money losing trades in his personal name utilizing investor funds, even though RCG knew that Hudgins was improperly operating an unregistered Commodity Pool at RCG.

6.      On or about May 13, 2008, the Commodity Futures Trading Commission ("CFTC") initiated a suit captioned *CFTC v. George Hudgins* in Texas seeking the appointment of a receiver, and freezing all assets belonging to Hudgins.  Kelly Crawford of Dallas, Texas was appointed as the receiver ("Receiver") and pursuant to the *Consent Order of Preliminary Injunction and Other Equitable Relief* has collected $29,000,000 to date and is pursuing additional sources of funds.  Regardless of the amount collected by the Receiver, there will be a shortfall between the funds Hudgins collected from the Class victims of at least $ 40,000,000.

7.      On or about July 21, 2008, the United States Attorney sought a criminal indictment against Hudgins in the matter styled *United States of America v. George D. Hudgins*.  It is understood that Hudgins is in the process of negotiating a plea bargain.

4

## II.  JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and 7 U.S.C. §§ 1 et seq.

9.      Venue is proper under 28 U.S.C. § 1391(a) and (b) and 7 U.S.C. § 25(c), because the defendants' unlawful course of conduct occurred in large part in this District.

## III.  PARTIES

10.      Plaintiffs are individuals who invested their personal and retirement money with Hudgins during the Class Period and were damaged thereby in connection with transactions in futures and options on futures that took place in accounts carried by RCG.  Plaintiffs' places of residence are as follows:

(a)      Barbara J. Carey and James R. Carey, 336 CR 199, Nacogdoches, TX.

(b)      Dave Fleckenstein, 557 Terry Crawford Dr., Nacogdoches, TX.

(c)      Mildred Pitts, 413 Sandra Jean, Nacogdoches, TX.

11.      Defendant Hudgins is an individual who resides at 3737 Skyline Drive, Nacogdoches, Texas.  Hudgins also does business as "George D. Hudgins LLC," a Texas limited liability company, created on November 12, 2004 and also located at 3737 Skyline Drive, Nacogdoches, Texas.  Hudgins, individually and dba as George D. Hudgins LLC (the general partner of 3737 Financial), controls the day-to-day operations of the unregistered Commodity Pool, including, but not limited to, making the trading decisions for the Commodity Pool and the opening of personal trading accounts at RCG for the purpose of trading on behalf of the unregistered Commodity Pool.  Hudgins has never been registered with either the CFTC or the National Futures Association ("NFA") in any capacity.

5

12.     RCG is a limited liability company organized and existing under the laws of the State of Illinois.  RCG is registered with the CFTC as an FCM and is a member of the NFA. RCG maintains its headquarters at 216 West Jackson Blvd., Suite 400, Chicago, IL.

13.     Does 1 through 10 are additional defendants who are presently unknown to plaintiffs but who either assisted Hudgins or aided and abetted Hudgins in carrying out his fraudulent scheme.

## IV.  CLASS ALLEGATIONS

14.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP").  The Class in this action consists of persons, other than defendants, their employees, affiliates and co-conspirators, who invested money with and through Hudgins during the Class Period and were damaged thereby in connection with transactions in accounts carried by RCG.

15.     Hudgins invested funds entrusted to him by members of the Class on markets designated by the CFTC as contract markets pursuant to Section 5 of the CEA, 7 U.S.C. § 7. Hudgins traded in, and invested Class members' money in, standardized futures and options on futures contracts on regulated exchanges designed to facilitate and ease trading in one central marketplace by traders who are located throughout the world.

16.     The number of persons or entities who invested money with Hudgins during the Class Period and were damaged thereby in connection with transactions in accounts carried by RCG is approximately 300.  Accordingly, joinder is impracticable pursuant to FRCP Rule 23(a)(1).

17.     Common issues of fact or law predominate over individual issues within the meaning of FRCP Rule 23(a)(2).  Common issues of law and fact include but are not limited to whether:

    (a)     Defendants' conduct violated the CEA;

    (b)     Class members were damaged by defendants' unlawful conduct and the measure of damages;

    (c)     injunctive relief is appropriate; and

    (d)     a constructive or actual trust should be impressed upon the ill-gotten gains obtained by defendants as fruits of their misconduct.

18.     Plaintiffs' interests are typical of, and not antagonistic to the interests of, the Class.

19.     Plaintiffs have retained competent counsel experienced with class actions and commodities litigation who intend to vigorously prosecute this action.

20.     Common issues predominate.  A class action is superior to all other methods for the fair and efficient adjudication of this controversy.

21.     Class members' identities and their investments with Hudgins can generally be identified by records held by the Receiver.

22.     Plaintiffs do not anticipate any difficulties in the management of this action as a class action.

## V.  STATUTORY BACKGROUND

23.     A "Commodity Pool" is defined in Regulation 4.10(d)(l) of the Act 17 C.F.R. § 4.10(d)(l), as any investment trust, syndicate or similar form of enterprise operated for the purpose of trading commodity interests.

24.     A "Commodity Pool operator" is defined in Section 1a(5) of the Act, 7 U.S.C. § 1(a)(5), as any person engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities or otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility.

## VI.  FACTS

### A.     Hudgins' Rosenthal Collins Group Accounts

25.     3737 Financial is a Texas limited partnership created on November 12, 2004 and located at 3737 Skyline Drive, Nacogdoches, Texas.  Hudgins receives, accepts and pools funds from members of the public to trade futures and options on futures through 3737 Financial. Hudgins is the unregistered CPO of 3737 Financial.

26.     Rather than opening a commodity trading account with an FCM in the name of the Commodity Pool -- here, 3737 Financial -- Hudgins opened multiple trading accounts in his own name and traded the funds invested in 3737 Financial through these accounts.

27.     On December 15, 2003, Hudgins opened a trading account (hereinafter, Account "00") in the name "George D. Hudgins," at RCG.  Through Account "00," Hudgins traded futures and options on futures, including contracts for silver, sugar, and the S&P 500 index.

8

28.     Thereafter, from in or about 2005 to 2007, Hudgins opened a total of six additional trading accounts with RCG in the name "George D. Hudgins" (hereinafter, Accounts "'01," "02," "03," "04," "05," and "06 ").

      (a)    Account "01" was opened in November 2005.  Through the "01" Account, Hudgins traded futures and options on futures, including contracts for T-Bonds, silver, crude oil and the S&P 500 index.

      (b)    Accounts "02" and "03" were opened in January 2006.  Hudgins did no trading in Account "02".  Through the "03" Account, Hudgins traded futures and options on futures in the S&P 500 index.

      (c)    Account "04" was opened in September 2006.  Through the "04" Account, Hudgins traded futures in the S&P 500 index.

      (d)    Account "05" was opened in September 2007.  Through the "05" Account, Hudgins traded futures, including contracts for crude oil, cotton, the S&P 500 index, and coffee.

      (e)    Account "06" was opened in July, 2004.  Through the "06" Account, Hudgins traded futures, including contracts for crude oil, the NASDAQ index and the S&P 500 index.

## B.     Hudgins Operates 3737 Financial as a Commodity Pool

29.     On November 14, 2004, Hudgins created 3737 Financial.  Beginning in at least January 2005, Hudgins, with the assistance of others, began operating, and soliciting the public to invest, or remain invested, in 3737 Financial – the Commodity Pool.  Hudgins solicited individual investors to (i) write checks to 3737 Financial; and/or (ii) on information and belief, send or wire funds directly to RCG with instructions to deposit the funds into Hudgins' personal

accounts at RCG, by representing to them that their money would be pooled with funds from other investors and that Hudgins would use the money to trade futures and options on futures contracts in association with RCG, through a RCG trading account.

30. The checks received from investors were deposited into the account of 3737 Financial at BancorpSouth in Nacogdoches, Texas.  Thereafter, on information and belief, Hudgins caused the transfer of some or all of the investors' funds from 3737 Financial's bank account into a different bank account in the name of "George D. Hudgins" located at BancorpSouth in Nacogdoches, Texas.  Subsequently, Hudgins wired some or all of the investors' funds from the BancorpSouth account into accounts held at RCG through which Hudgins traded commodity futures and options on futures on behalf of the investor victims.

31. Contemporaneously with investing in the Commodity Pool, investors entered into a one page agreement with 3737 Financial "for the purpose of trading S&P [500] future[s] and other investments as George D. Hudgins, General Partner, sees fit."  The one page agreement also provides "Hudgins will trade for [investor's name] benefit as a partner, and profits will be split 80% [investors name] and 20% Hudgins."

## C.  **Hudgins' Fraudulent Solicitations of Participants**

32. Since as early as January 2005, as part of their scheme to defraud investors, Hudgins, with the assistance of others, solicited investors and prospective investors to invest, or remain invested, in the Commodity Pool through promotional packets, newsletters, group presentations and face-to-face meetings.  In these solicitation materials and presentations, Hudgins and others made numerous material misrepresentations and omissions to induce investors and prospective investors to invest, or remain invested in the Commodity Pool,

including false representations about the length of time the pool had been in existence, the

historical profitability of the Commodity Pool, and the size of the Commodity Pool's assets.

### *(i)*   ***January 2005 Promotional Packet***

33.   For example, in January 2005, Hudgins created and provided to investors a

promotional packet entitled "Hudg-Investments[:] Making Money in a Bull or Bear Market."

The Hudgins promotional material discussed, among other things, the purported historical

performance of the Commodity Pool.  In the promotional packet, Hudgins and others stated that

the Commodity Pool had gross returns as follows:

- 99% for 2000,
- 55% for 2001,
- 57% for 2002,
- 46% for 2003,
- 47% for 2004, and
- 8.1 3% for January, 2005.

34.   These statements regarding the performance of the Commodity Pool were false

and misleading in that:

(a)   3737 Financial did not exist until November 2004, and thus the

Commodity Pool had no "returns" during the time period 2000 to October,

2004; and

(b)   for the years 2003, 2004, and 2005, RCG trading account records in the

name of George D. Hudgins show that, rather than having the net returns

claimed, the trading accounts suffered losses in:  (a) December 2003 of

$42,256.26; (b) the full 2004 calendar year of $1,614,307.97; and (c)

January 2005 of $141,780.51.

11

35.     Hudgins and others further represented in the promotional packet that 3737 Financial invests in S&P 500 futures, currencies, U.S. treasury bonds, gold and silver and, as of January 2005, had an investment portfolio of approximately $23 million.  In fact, as of January 2005, the only accounts in existence at RCG in the name "George D. Hudgins" – Account "00" and Account "06" - had a net value of $75,713.86.

36.     Hudgins and others made misrepresentations regarding the Commodity Pool in the promotional packet knowing them to be false or with reckless disregard as to their truth.

*(ii)*     *Newsletters*

37.     Hudgins and others created and provided to investors and prospective investors monthly and quarterly newsletters entitled "The Hudg-Report" that discussed the purported historical performance of the Commodity Pool.  In particular in the February 2005, February 2006 and Fourth Quarter 2006 Hudg-Reports, Hudgins and others misrepresented, among other things, that the Commodity Pool had a net profit of:

·     8.13% for January 2005,
·     approximately 3% for January 2006, and
·     29.27% for Fourth Quarter 2006, respectively.

38.     Similar to the returns listed in the promotional packet, these representations were false and misleading.  RCG trading account records in the name George D. Hudgins show a loss in January 2005 of $141,780.51, a loss in January 2006 of $661,977.71 and a loss in Fourth Quarter 2006 of $988,157.24.

39.     Hudgins and others made these representations regarding the Commodity Pool in the newsletters knowing them to be false or with reckless disregard as to their truth.

12

### *(iii)*   *January 2007 Presentation*

40.    In January, 2007 Hudgins, and others assisting him in the fraudulent scheme, made a presentation during an annual meeting of investors and prospective investors in Nacogdoches, Texas (the "January 2007 presentation").  During the presentation, Hudgins made, among others, the following material misrepresentations and omissions:

    (a)    The Commodity Pool had a net profit of 99% for 2000, 54.96% for 2001, 57.12% for 2002, 45.86% for 2003 and 46.79% for 2004.  These representations are false and misleading;

    (b)    the Commodity Pool had profits of 52.33% for 2005 and 22.5% for 2006. These representations are false because in 2005 and 2006 the RCG trading accounts suffered losses of $9,445,989.11 and $11,192,620.05, respectively;

    (c)    Hudgins failed to disclose that the operation of Commodity Pools is regulated by the CFTC and that Hudgins was required to be registered as a CPO;

    (d)    the Commodity Pool's trading account was at RCG, but failed to disclose that no 3737 Financial account existed at RCG and that the only accounts at RCG were Hudgins' personal trading accounts; and

    (e)    as of January 2007, 3737 Financial had an investment portfolio of approximately $80 million and that there were about 100 investors.  In fact, at that time, the net value of Hudgins' trading accounts at RCG in the name of "George D. Hudgins" was negative $100,199.38.

41.     Hudgins made these representations regarding the Commodity Pool during the presentation knowing them to be false or with reckless disregard as to their truth when made, as part of a scheme to defraud the investor victims.

**D.     Value of Hudgins' Accounts at RCG**

42.     As of January 31, 2007, the total net value of the investments in accounts in the name of George D. Hudgins at RCG was negative $100,199.38.  The accounts were operating at a loss.  This account balance represents a gross difference and is in stark contrast to Hudgins' misrepresentation made at the January 2007 presentation to investors and prospective investors that the Commodity Pool contained, at that time, approximately $80 million, and the February 2008 meeting at which Hudgins represented the value of the Commodity Pool to have been $100 million in January 2007.

43.     As of January 31, 2008, the total net value of the investments in accounts in the name of George D. Hudgins at RCG was $4,498,550.45.  This account balance also represents a gross difference and is in stark contrast to Hudgins' misrepresentation made at the February 2008 meeting that the Commodity Pool contained approximately $200 million.

44.     The relationship between what Hudgins told investors and prospective investors in his varied solicitations and actual RCG trading account values is detailed in the chart below:

| Time Period | Hudgins' Misrepresentations as to profit as a percent | Actual losses |
|---|---|---|
| 2000 | 99% | 3737 Financial did not exist |
| 2001 | 55% | 3737 Financial did not exist |
| 2002 | 57% | 3737 Financial did not exist |
| 2003 | 46% | 3737 Financial did not exist; however, losses |

14

| Time Period | Hudgins' Misrepresentations as to profit as a percent | Actual losses |
|---|---|---|
|  |  | suffered in the RCG accounts in December 2003 were $42,256.26 |
| 2004 | 46.79% | 3737 Financial did not exist until November 2004; however, losses suffered in the RCG accounts were $1,614,307.97 |
| January 2005 | 8.13% | Losses suffered in the RCG accounts were $141,780.51 |
| 2005 | 52.33% | Losses suffered in the RCG accounts were $9,445,989.11 |
| January 2006 | 3% | Losses suffered in the RCG accounts were $661,977.71 |
| Fourth Quarter 2006 | 29.27% | Losses suffered in the RCG accounts were $988,157.24 |
| 2006 | 22.5% | Losses suffered in the RCG accounts were $11,192,620.05 |
| 2007 | 57% | Losses suffered in the RCG accounts were $5,077,748.50 |

45.    While on April 30, 2008, the RCG accounts in the name of George D. Hudgins reflected a net liquidating value of $8,197,044.94, in actuality Hudgins had lost a total of $28,966,527.71 in the RCG accounts from December 2003 through April 2008 trading futures and options on futures.

**E.    RCG's Aiding and Abetting**

46.    Hudgins' scheme was aided and abetted by  RCG which carried all of the accounts utilized by Hudgins in connection with his deliberate scheme to defraud investor victims, and substantially assisted Hudgins notwithstanding the fact that RCG  knew that Hudgins was:

(a)    Trading in his personal accounts for scores or hundreds of outside investors at all relevant times during the Class Period;

(b)    bringing potential investors to RCG's offices and facilities in Chicago, including without limitation RCG's stations on the floor of the CME, as part of a fraudulent scheme whereby Hudgins held himself out to investors and RCG employees confirmed that Hudgins was closely affiliated with RCG;

(c)    making representations in the presence of RCG employees and/or officers that potential investors' funds were "secured" and "bonded" by RCG;

(d)    violating CFTC rules by depositing investor funds into the personal accounts of Hudgins at RCG; operating as an unregistered CPO through the personal accounts Hudgins held at RCG;

(e)    on information and belief, having investors either send or wire funds to RCG with instructions to deposit the funds into the personal accounts of Hudgins for trading in futures and options on futures; and

(f)    incurring massive trading losses while running up gigantic commissions that were paid to RCG in connection with his rapid-fire day trading strategy.

47.    Notwithstanding its knowledge of the foregoing, RCG continued to allow Hudgins to utilize the RCG name, facilities, personnel, agents and employees, including Lupori and Berman, to court investors and hold himself out as an affiliate of RCG.

48.    RCG also continued to permit Hudgins to execute his ever-larger loss-making trades utilizing investor funds through RCG, even though RCG knew that Hudgins was

improperly operating his unregistered Commodity Pool utilizing accounts in his own personal name.

49.     Notwithstanding RCG's knowledge of Hudgins' recurring and ongoing trading losses, RCG, together with its agents Lupori and Berman, assisted Hudgins in his fraudulent scheme by making knowingly false representations to prospective investors in Hudgins' unregistered Commodity Pool that Hudgins had the "Midas touch," and an investment in Hudgins' Commodity Pool was safe, had been profitable in the past and would be profitable in the future.

50.     Further, in order to assist Hudgins in soliciting additional investors and amassing ever-larger sums to fund the trading by Hudgins' unregistered Commodity Pool in Hudgins' accounts at RCG, RCG, per its employees and/or agents including Lupori, acquiesced in and permitted Hudgins' use of RCG's facilities on the floor of the CME and Chicago offices for customer meetings.  Hudgins invited prospective investors to RCG's facilities on the floor of the CME and Chicago offices to impress them with the state-of-the-art facilities and substantial offices to which he had access.  At these investor meetings at RCG's facilities on the floor of the CME and Chicago offices, Hudgins, in the presence of employees and/or agents of RCG, including Lupori, held himself out as closely affiliated with RCG.  RCG permitted Hudgins so to utilize its facilities because RCG wished to enable Hudgins to continue or increase his massive trading (and the resulting very substantial commissions) in Hudgins' accounts carried by RCG.

## VII.  <u>VIOLATIONS OF THE ACT AND REGULATIONS</u>

### <u>COUNT ONE</u>

### <u>Fraud By Commodity Pool Operator (Against Hudgins)</u>

### (Violations of Section 4<u>o</u>(1) of the Act, 7 U.S.C. § 6<u>o</u>(1),<br>and Regulation 4.41(a), 17 C.F.R. § 4.41(a) against Hudgins)

51.     Plaintiffs incorporate by reference and reallege the preceding allegations, as though fully set forth herein.

52.     Section 4<u>o</u>(1) of the Act, 7 U.S.C. § 6<u>o</u>(1), prohibits CPOs from using the mails or any other means of interstate commerce to:

> (A) employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or

> (B) engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

53.     Regulation 4.41(a) provides that no CPO may advertise in a manner that:

> (1) Employs any device, scheme or artifice to defraud any participant or client or prospective participant or client; or

> (2) Involves any transaction, practice, or course of business which operates as a fraud or deceit upon any participant or client or any prospective participant or client.

54.     During the Class Period, Hudgins acted as a CPO by soliciting, accepting or receiving funds from others and engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of trading in futures and options on futures.

55.     As set out in paragraphs 1 through 50, during the Class Period, Hudgins employed a device, scheme or artifice to defraud or engaged in a transaction, practice or course of business,

including through advertising in newsletters, seminars, and promotional packages, which

operated as a fraud or deceit upon plaintiffs and the Class in violation of Section 4o(1) of the

Act, 7 U.S.C. § 6o(1) and Regulation 4.41(a), 17 C.F.R. § 4.41(a).

56.     Each misrepresentation or omission of material fact, actual or attempted act to

cheat, defraud, or deceive, including but not limited to those specifically alleged herein, is

alleged as a separate and distinct violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) and

Regulation 4.41(a), 17 C.F.R. § 4.41(a).

57.     As a result of the foregoing violations of the CEA, Hudgins is liable to plaintiffs

and the Class pursuant to Section 22(a) of the CEA, 7 U.S.C. § 25(a).

58.     Plaintiffs and the Class were damaged by defendant's unlawful conduct.

Plaintiffs and the Class are each entitled to actual damages for the violations of the CEA alleged

herein.

## **COUNT TWO**

### **Fraud in Connection with a Futures Contract (Against Hudgins)**

### **(Violations of Sections 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i)-(iii))**

59.     Plaintiffs incorporate by reference and reallege the preceding allegations, as

though fully set forth herein.

60.     Section 4b(a)(2) of the Act, 7 U.S.C. § 6b(a)(2), makes it unlawful

> for any person, in or in connection with any order to make, or the
> making of, any contract of sale of any commodity for future
> delivery, made, or to be made, for or on behalf of any other person
> if such contract for future delivery is or may be used for (A)
> hedging any transaction in interstate commerce in such commodity
> or the products or byproducts thereof, or (B) determining the price
> basis of any transaction in interstate commerce in such commodity,
> or (C) delivering any such commodity sold, shipped, or received in
> interstate commerce for the fulfillment thereof – (i) to cheat or

19

> defraud or attempt to cheat or defraud such other person; (ii)
> willfully to make or cause to be made to such other person any
> false report or statement thereof, . . .[or]; (iii) willfully to deceive
> or attempt to deceive such other person by any means whatsoever
> in regard to any such order or contract or disposition or execution
> of any such order or contract, or in regard to any act of agency
> performed with respect to such order or contract for such person.

61.     During the relevant Class Period, Hudgins and others cheated or defrauded or

attempted to cheat or defraud, willfully made or caused to be made false reports about the

purported profitability of 3737 Financial in monthly or quarterly newsletters and other

promotional material, and willfully deceived or attempted to deceive plaintiffs and the Class by

making misrepresentations of material facts, and omitting material facts in violation of Sections

4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. § 6b(a)(2)(i)-(iii).

62.     Each misrepresentation or omission of material fact, actual or attempted act to

cheat, defraud, or deceive, including but not limited to those specifically alleged herein, is

alleged as a separate and distinct violation of Sections 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. § 6b.

63.     As a result of the foregoing violations of the CEA, Hudgins and others not known

to plaintiffs at this time are liable to plaintiffs and the Class pursuant to Section 22(a) of the

CEA, 7 U.S.C. §  25(a).

64.     Plaintiffs and the Class were damaged by defendants' unlawful conduct.

Plaintiffs and the Class are each entitled to actual damages for the violations of the CEA alleged

herein.

## COUNT THREE

### Fraud in Connection with an Options Contract
### (Against Hudgins)

### (Violations of section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulations 33.10(a)-(c), 17 C.F.R. §§ 33.10(a)-(c))

65.     Plaintiffs incorporate by reference and reallege the preceding allegations, as though fully set forth herein.

66.     Section 4c(b) of the Act, 7 U.S.C. § 6c(b), makes it unlawful to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity regulated under the Act which is of the character of, or is commonly known to the trade as, an "option," "privilege," "indemnity," "bid," "offer," "put," "call," "advance guaranty," or "decline guaranty," contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

67.     Regulations 33.10(a)-(c), 17 C.F.R. §§ 33.10(a)-(c), make it unlawful for any person, directly or indirectly, (a) to cheat or defraud or attempt to cheat or defraud any person; (b) to make or cause to be made any false report or statement, or (c) to deceive or attempt to deceive any other person by any means whatsoever, in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction.

68.     As set out above, during the relevant period, Hudgins and others violated Section 4c(b) of the Act, 7 U.S.C.§ 6c(b), and Sections 33.10(a)-(c) of the Regulations, 17 C.F.R. §§ 33.10(a)-(c), in that, in connection with offers to enter into, the entry of, or the confirmation of the execution of, commodity options transactions, defendants cheated, defrauded, or deceived, or

attempted to cheat, defraud or deceive plaintiffs and the Class, by making false, deceptive or misleading representations of material facts and by failing to disclose material facts, and by making or caused to be made false reports about the purported profitability of 3737 Financial in monthly or quarterly newsletters and other promotional material.

69.     Each misrepresentation or omission of material fact, actual or attempted act to cheat, defraud, or deceive, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4c(b) of the Act, 7 U.S.C.§ 6c(b), and Regulations 33.10(a)-(c), 17 C.F.R. §§ 33.10(a)-(c).

70.     As a result of the foregoing violations of the CEA, Hudgins and others not known to plaintiffs at this time are liable to plaintiffs and the Class pursuant to Section 22(a) of the CEA, 7 U.S.C. §  25(a).

71.     Plaintiffs and the Class were damaged by defendants' unlawful conduct. Plaintiffs and the Class are each entitled to actual damages for the violations of the CEA alleged herein.

## COUNT FOUR

### Failure to Register As a Commodity Pool Operator
### (Against Hudgins)

### (Violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1))

72.     Plaintiffs incorporate by reference and reallege the preceding allegations, as though fully set forth herein.

73.     Section 4m(1) of the Act, 7 U.S.C § 6m(1), provides that it is unlawful for any CPO, unless registered under the Act, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as a CPO.

22

74.     As set out herein, during the Class Period, Hudgins and others have used the mails or instrumentalities of interstate commerce in or in connection with a Commodity Pool as a CPO while failing to register as a CPO, in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1).

75.     Hudgins and others not known to plaintiffs at this time do not qualify for a registration exemption under either the Act or Regulations.

76.     As a result of the foregoing violations of the CEA, Hudgins and others not known to Plaintiffs at this time are liable to plaintiffs and the Class pursuant to Section 22(a) of the CEA, 7 U.S.C. §  25(a).

77.     Plaintiffs and the Class were damaged by defendants' unlawful conduct. Plaintiffs and the Class are each entitled to actual damages for the violations of the CEA alleged herein.

## COUNT FIVE

### (Aiding and Abetting Commodities Fraud Against RCG)

78.     Plaintiffs incorporate by reference and reallege the preceding allegations, as though fully set forth herein.

79.     RCG knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.  RCG did so knowing of Hudgins and others' violation of law, and willfully intended to assist those violations in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

80.     RCG substantially assisted in the aforesaid violations of law by executing the trades and providing credit to Hudgins, while simultaneously being informed of Hudgins' unlawful use of personal accounts to execute trades for an unregistered Commodity Pool.

81.     RCG allowed Hudgins to utilize its facilities and personnel, agents and employees, including Lupori and Berman, to court investors and permitted Hudgins to hold himself out as an affiliate of RCG.

82.     Plaintiffs and the Class are each entitled to actual damages for the violation of the CEA alleged herein.

83.     Plaintiffs and the Class were damaged by defendants' unlawful conduct.  As a further direct and proximate result of the acts of RCG, plaintiffs and the Class have been required to act in the protection of their interests by filing this action, and have incurred attorneys' fees, and other expenditures in a sum to be proven in trial.

## JURY DEMAND

84.     Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment:

(a)     Ordering that this action proceed as a class action as to all claims previously alleged;

(b)     enjoining defendants' unlawful conduct as alleged herein;

(c)     awarding money damages, including prejudgment interest, on each claim in an amount to be established at trial;

(d)     awarding statutory attorneys' fees and costs, and other relief;

(e)     impressing a trust on the ill-gotten gains of defendants in the ultimate res of which each Class member shall have an undivided interest;

(f)     directing further proceedings to determine the distribution of the trust among Class members, <u>inter se</u>, and award attorneys' fees and expenses to plaintiffs' counsel; and

(g)     awarding such other relief as to this Court may seem just and proper.

Dated: August 28, 2008

FORMAN LAW FIRM, P.C.

/S/ Bryan T. Forman
Bryan T. Forman
TBN 07258800
117 East Houston Street
Tyler, TX 75702
(903) 597-2221
(903) 597-2224 (fax)
bryan@formanlawfirm.com

Of Counsel:

LOUIS F. BURKE, P.C.
Louis F. Burke
Leslie Wybiral
460 Park Avenue, 21ST Floor
New York, NY 10022
(212) 682-1700

LAW OFFICE OF
CHRISTOPHER J. GRAY, P.C.
Christopher J. Gray
460 Park Avenue, 21ST Floor
New York, NY 10022
(212) 838-3221

*Attorneys for Plaintiffs*